**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
)
IN RE GUANTANAMO BAY DETAINEE      )     **Misc. No. 12-mc-398 (RCL)**
LITIGATION                          )
———————————————————————)
)
**SAEED MOHAMMED SALEH HATIM,**     )
*et al.*,                           )
                    **Petitioners**  )
            v.                      )     **Civil No. 05-cv-1429 (RCL)**
)
**BARACK H. OBAMA,** *et al.*        )
)
                    **Respondents**  )
———————————————————————)
)
**FADHEL HUSSEIN SALEH HENTIF,**    )
*et al.*,                           )
                    **Petitioners**  )
            v.                      )     **Civil No. 06-cv-1766 (RCL)**
)
**BARACK H. OBAMA,** *et al.*        )
)
                    **Respondents**  )
———————————————————————)
)
**ABDURRAHMAN ABDALLAH ALI**        )
**MAHMOUD AL SHUBATI,** *et al.*,    )
                    **Petitioners**  )
            v.                      )     **Civil No. 07-cv-2338 (RCL)**
)
**BARACK H. OBAMA,** *et al.*        )
)
                    **Respondents**  )
———————————————————————)

## <u>MEMORANDUM OPINION</u>

## I.    <u>INTRODUCTION</u>

**O**n May 23, 2013, President Obama promised, concerning detainees held at Guantanamo

Bay, that "[w]here appropriate, we will bring terrorists to justice in our courts and our military

justice system.  And we will insist that judicial review be available for every detainee."  Remarks

by the President at the National Defense University (May 23, 2013) (transcript available at

http://www.whitehouse.gov/the-press-office/2013/05/23/remarks-president-national-defense-

university).  This matter concerns whether the President's insistence on judicial review may be

squared with the actions of his commanders in charge of the military prison at Guantanamo Bay.

Currently, it cannot.

Petitioners are detainees at Guantanamo Bay who are in the process of seeking habeas

corpus relief and whose access to counsel is governed by this Court's 2008 Protective Order.

Petitioners allege that the Joint Detention Group ("JDG"), the group responsible for detention

operations within Joint Task Force-Guantanamo ("JTF-GTMO"), has instituted new search and

procedures that impair petitioners' access to legal counsel.

The petitioners' unique circumstances render this case no ordinary challenge to prison

regulations:  At its heart, this case is about petitioners' ability to invoke the writ of habeas corpus

through access to the Court and access to counsel.

Upon consideration of petitioners' Motions [37 and 38], the government's Opposition

[42], petitioners' replies [44 and 45], the arguments presented at this Court's open and sealed

hearings held June 5, 2013, the entire record herein, the applicable law, and for the reasons set

forth below, the Court finds the JDG's new procedures invalid as they pertain to access to

counsel and will GRANT petitioners' motions in part and DENY petitioners' motions in part.

## II.  **BACKGROUND**

### A.  **Procedural Background**

Before the Court is an Emergency Motion [37] to Enforce the Right of Access to Counsel

filed by petitioners Abdurrahman Abdallah Ali Mahmoud al Shubati (ISN 224[1]) and Fadhel

Hussein Saleh Hentif (ISN 259).  Emergency Mot. to Enforce the Right of Access to Counsel 1,

May 22, 2013, ECF No. 37 ("Hentif & Al Shubati Mot.").   Also before the Court is an

Emergency Motion [38] Concerning Access to Counsel filed by petitioner Saeed Mohammed

Saleh Hatim (ISN 255) on his own behalf and on behalf of several other Guantanamo detainees.

Emergency Mot. Concerning Access to Counsel 1–2, May 22, 2013, ECF No. 38 ("Hatim

Mot.").  All the petitioners request that this Court order the government to discontinue the use of

certain procedures that petitioners allege inhibit their access to legal counsel.   Specifically,

petitioners request the Court to order (1) that they may meet with counsel in person or by phone

without being subject to the new search protocol instituted by the JDG, (2) that they may meet

with counsel in person or by phone within their housing camps, and (3) that the government may

not transport detainees within the detention facility for attorney meetings or phone calls using

new vans that petitioners contend force them into painful stress positions.

Petitioners are at different stages in their respective habeas cases before the Court. Al

Shubati originally filed a petition for a writ of habeas corpus on December 31, 2007.  *See* Pet.

For Writ of Habeas Corpus, *Al Shubati v. Obama*, No. 07-CV-2338 (UNA) (D.D.C. Dec. 31,

2007), ECF No. 1.   On March 11, 2013, this Court dismissed al Shubati's petition without

prejudice at petitioner's and the government's joint request.   *See* Stipulation and Order

Dismissing Pet., *Al Shubati v. Obama*, No. 07-CV-2338 (UNA) (D.D.C. Mar. 11, 2013), ECF

No. 261.  Hentif filed his petition for habeas corpus on October 16, 2006.  *See* Pet. For Writ of

Habeas Corpus, *Hentif v. Obama*, No. 06-CV-1766 (HKK) (D.D.C. Oct. 16, 2006), ECF No. 1.

The Court, Judge Henry Kennedy presiding, denied his petition on August 1, 2011.  *See* Mem.

---

[1] "ISN" is the acronym for "Internment Serial Number," and each detainee currently housed at Guantanamo Bay has
been assigned an ISN.  *Bostan v. Obama*, 821 F. Supp. 2d 80, 82 n.1 (D.D.C. 2011) (citing *Al-Harbi v. Obama*,
Civil Action No. 05–2479(HHK), 2010 WL 2398883, at *3 n.2 (D.D.C. May 13, 2010)).

Op., *Hentif v. Obama*, No. 06-CV-1766 (HKK) (D.D.C. Aug. 1, 2011), ECF No. 281.  Hentif's

appeal of the dismissal of his petition is currently before the D.C. Circuit.  *See* Notice of Appeal,

*Hentif v. Obama*, No. 06-CV-1766 (RCL) (D.D.C. Oct. 8, 2012), ECF No. 292.  Hatim filed his

petition for habeas corpus on July 20, 2005.  *See* Pet. For Writ of Habeas Corpus, *Hatim v.

Obama*, No. 05-CV-1429 (RCL) (D.D.C. Jul. 20, 2005), ECF No. 1.  The Court, Judge Ricardo

Urbina presiding, granted his petition for a writ of habeas corpus on December 15, 2009.  *See*

Order, *Hatim v. Obama*, No. 05-CV-1429 (RCL) (D.D.C. Dec. 15, 2009), ECF No. 334.  The

D.C. Circuit vacated Judge Urbina's order on February 15, 2011 and remanded the case for

further proceedings.  *Hatim v. Gates*, 632 F.3d 720, 721 (D.C. Cir. 2011) (per curiam).  Hatim's

case was subsequently reassigned due to Judge Urbina's retirement, and this Court entered a

scheduling order for Hatim's petition for habeas corpus after a classified hearing on May 3,

2013.  *See* Order, *Hatim v. Obama*, No. 05-CV-1429 (RCL) (D.D.C. Dec. 15, 2009), ECF No.

415.

### B.    Factual Background

Petitioners are housed within two separate "camps" within the Guantanamo detention

facility.  Resp't's Opp'n to Pet'rs' Emergency Mots. Concerning Access to Counsel 6, June 3,

2013, ECF No. 42 ("Opp'n").  These camps—known as Camps 5 and 6—are modeled after, and

comparable to, maximum security prisons in the United States.  Opp'n, Ex. 1, at ¶¶ 10, 14, June

3, 2013, ECF No. 42 ("Bogdan Decl.").  Previously, meetings between petitioners and habeas

counsel took place in Camps 5 and 6, Hatim Mot. Ex. A, at ¶ 5, May 22, 2013, ECF No. 38-1,

though the government contends that attorney–client meetings have not taken place in Camps 5

and 6 for some time.  Bogdan Decl. ¶¶ 9, 13.

Currently, to meet with counsel or speak with counsel by phone, petitioners must travel

from their housing camp to other buildings—known as Camps Delta and Echo—located nearby within the Guantanamo detention facility.  *Id.* ¶ 22.  Petitioners are transported to Camp Delta for all phone calls with counsel and to Camp Echo for all in-person meetings with counsel.  *Id.* ¶¶ 5, 8.  Camps Delta and Echo contain dedicated facilities for conducting detainee phone calls and meetings.  For example, Camp Echo has specialized facilities to screen visitors, including attorneys, for contraband before they meet with detainees.  *Id.* ¶ 6.  Moreover, Camp Echo has a centralized facility from which guards may visually monitor attorney–client meetings remotely, meaning guards need not sit outside the meeting room for the duration of the detainee's meeting with counsel.  *Id.*  Similarly, Camp Delta has facilities "specifically designed and equipped for telecom operations."  *Id.* ¶ 8.

Camps 5 and 6, by contrast, lack dedicated facilities for phone calls.  *Id.* ¶¶ 8–9.  With respect to attorney–client meetings, Camp 6 at present has only two small rooms to accommodate such meetings, though Col. Bogdan, commander of the JDG, directed in September 2012 that those rooms would no longer be used for meetings between detainees and any non-JTF-GTMO personnel.  *Id.* ¶¶ 13–16.  In his sworn declaration, Col. Bogdan stated that Camp 5 has no rooms for attorney–client meetings.  *Id.* ¶ 11.  Nevertheless, according to a review of the Guantanamo detention facility prepared by Adm. Walsh in 2009, Camp 5 had "a climate controlled meeting room for legal representation."  Review of Department Compliance with President's Executive Order on Detainee Conditions of Confinement 11 ("Walsh Report").  It is unclear whether Col. Bogdan has since restricted the use of this room, as in Camp 6, or whether JTF-GTMO has repurposed the room, though what purpose could be greater than counsel access this Court cannot say.  For security reasons, attorneys cannot meet with detainees on the cell blocks or within detainee cells in the housing camps.  *See* Bogdan Decl. ¶ 11.  As a

result, detainees must leave their cells and travel to Camps Delta and Echo for phone calls and attorney–client meetings.

The process of transporting detainees from their housing camps to Camps Delta and Echo requires that they be searched and then transported by van to the relevant camp. *Id.* ¶¶ 17–22. Previously, the search protocol in effect for detainees at GTMO did not allow guards to frisk the area between a detainee's waist and mid-thigh except with authorization from the JDG Commander. *Id.* ¶ 17; Walsh Report 25. Instead, guards used a modified search procedure whereby a guard would grasp the waistband of a detainee's trousers and shake the detainee's pants in order to dislodge any contraband. Bogdan Decl. ¶ 17; Walsh Report 25. The purpose of this modified search procedure was "to avoid actions that could be construed as disrespectful" of detainees' religious or cultural sensitivities. Walsh Report 26. The use of the modified procedures represented a considered policy judgment on the part of the former JDG commanders: The commanders recognized that the modified search procedures "carrie[d] a level of risk," but they "accepted that risk out of an elevated respect for the religious concerns of the detainees." *Id.*

On June 7, 2012, command of the JDG passed to Col. John V. Bogdan. Bogdan Decl. ¶ 1. On May 3, 2013, JDG revised its search procedures for detainees to comport with the standard army search procedure. *Id.* ¶ 18. This standard procedure includes frisking and wanding of the detainee's groin area. *Id.* ¶ 20. As before, the search involves the guard grasping the detainee's waistband and shaking it vigorously to dislodge contraband. *Id.* The new search protocol, however, adds several additional elements: First, the guard gathers and crushes the fabric of the detainee's pants pockets to detect any objects in the pockets. *Id.* Second, the guard will search the detainee's groin area "by placing the guard's hand as a wedge between the

[detainee's] scrotum and thigh . . . and using [a] flat hand to press against the groin to detect anything foreign attached to the body." *Id.*   Third, the guard uses a flat hand to frisk the detainee's buttocks to ensure no contraband is hidden there. *Id.*   Fourth, "a hand-held 'wand' metal detector . . . is passed over the [detainee's] body." *Id.* ¶ 21.   The wand search includes the detainee's groin and buttocks area, and guards hold the wand about one to two inches from the detainee's body while conducting the wand search. *Id.*

Under the JDG's standard procedure, detainees are searched whenever (1) they are moved to a facility external to their housing camp or (2) they meet with any non-JTF-GTMO personnel. *Id.* ¶ 19.   According to Col. Bogdan, all detainee searches are conducted twice—once before leaving the housing camp or before a meeting with non-JTF-GTMO personnel and a second time prior to returning to the housing camp or after the meeting. *Id.*   However, during the sealed hearing held on June 5, 2013, counsel for petitioner Al-Mithali stated that detainees are actually searched four times—once prior to leaving their cells, once upon arriving at the external facility or meeting room, once prior to leaving the external facility or meeting room, and once more upon returning to their cells.   Sealed Hr'g Tr. 39, June 5, 2013.   The JDG's standard procedure requires searching detainees for all movements or meetings, including attorney meetings, phone calls with attorneys or family members, or medical appointments.   Bogdan Decl. ¶ 19.

For phone calls or attorney–client meetings, detainees must travel outside of Camps 5 and 6 to Camps Delta and Echo. *Id.* ¶ 21.   The JDG transports detainees from Camps 5 and 6 to Camps Delta and Echo by van. *Id.*   While traveling in the vans, detainees are restrained following standard military procedure using a 5-point fabric seatbelt harness. *Id.*   On April 1, 2013, the JDG introduced several new vans as part of a routine equipment upgrade and to

address detainee complaints about a lack of air conditioning in the vans. *Id.* The new vans

include larger air ducts to improve air conditioning, but lower ceilings. *Id.* Petitioners contend

that, as a result, the lower ceilings in the vans force detainees to sit in crouched and painful stress

positions for the duration of the van ride. Hatim Mot. 3; Hatim Mot. Ex. A ¶¶ 29–34; Hatim

Mot. Ex. G ¶ 9.

### C.    Legal Background

In a litany of rulings, this Court and the Supreme Court have affirmed that the federal

courts are open to Guantanamo detainees who wish to prove that their indefinite detentions are

illegal. In 2004, the Supreme Court rejected the government's argument that the federal courts

had no jurisdiction to hear detainee habeas petitions. *Rasul v. Bush*, 542 U.S. 466, 484 (2004).

Congress then twice amended the federal habeas statute, 28 U.S.C. § 2241, in an effort to

overturn the Supreme Court's ruling. First, Congress passed the Detainee Treatment Act of 2005

(DTA), Pub. L. No. 109-148, 119 Stat. 2680 (2005), but the Supreme Court held that the

provision of the DTA depriving courts of jurisdiction over detainee habeas petitions did not

apply to cases pending when the DTA was enacted. *Hamdan v. Rumsfeld*, 548 U.S. 557, 575–78

(2006). Second, Congress passed the Military Commissions Act of 2006 (MCA), Pub. L. No.

109-366, 120 Stat. 2600 (2006) (codified in part at 28 U.S.C. § 2241 & note), but the Supreme

Court declared that detainees "are entitled to the privilege of habeas corpus to challenge the

legality of their detention." *Boumediene v. Bush*, 553 U.S. 723, 771 (2008). The Supreme Court

further invalidated the provision of the MCA that stripped courts of jurisdiction to hear habeas

petitions from detainees. *Id.* at 792. This Court and the Supreme Court also held that

Guantanamo detainees have a concomitant right to the assistance of counsel. *Hamdi v.*

*Rumsfeld*, 542 U.S. 507, 539 (2004); *Al Odah v. United States*, 346 F. Supp. 2d 1, 5 (D.D.C.

2004).

These rulings raised significant questions about counsels' access to detainees and classified information.  This Court first began to address this problem in *Al Odah*, where Judge Kollar-Kotelly found that the Court had power "to fashion procedures by analogy to existing procedures, in aid of the Court's jurisdiction and in order to develop a factual record as necessary for the Court to make a decision on the merits of" detainee habeas claims.  346 F. Supp. 2d at 6; *see also Harris v. Nelson*, 394 U.S. 286, 298 (1969) ("[A] district court may, in an appropriate case, arrange for procedures which will allow development . . . of the facts relevant to disposition of a habeas corpus petition.").  Using this power, she proposed a framework for detainee counsel access.  *Al Odah*, 346 F. Supp. 2d at 13–15.  The government subsequently moved for a protective order "to prevent the unauthorized disclosure or dissemination of classified national security information."  *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174, 175 (D.D.C. 2004).  This Court designated Judge Joyce Hens Green to coordinate and manage all Guantanamo proceedings and rule on common procedural and substantive issues.  All then-pending Guantanamo cases, except those being heard by Judge Richard J. Leon, were transferred to Judge Green.  In November 2004, Judge Green issued an "Amended Protective Order and Procedures for Counsel Access to Detainees," which set guidelines and procedures for counsel access to detainees and to classified information.  Judge Green's protective order was ultimately a boon for the Court, for the Government, and for detainees as it settled many issues that would have otherwise, no doubt, required a great deal of litigation.

Judge Green's protective order stood without objection for four years.  In light of the *Boumediene* decision in 2008, the members of this Court again determined that a single judge should rule on common procedural issues to facilitate the expeditious resolution of Guantanamo

habeas cases.  *In re Guantanamo Bay Detainee Litig.*, Miscellaneous No. 08-442 (TFH), Order [1] at 1–2, July 2, 2012.  The Court designated Judge Thomas F. Hogan, like Judge Green, "to coordinate and manage proceedings in all cases involving petitioners presently detained at Guantanamo Bay, Cuba." *Id.*  All then-pending Guantanamo habeas cases, and all such cases thereafter filed, were transferred to Judge Hogan for case management and coordination.[2]  *Id.* Judge Hogan also determined that the Court should issue a new protective order.  After considering the parties' positions espoused both in written submissions and at a status conference, Judge Hogan issued a carefully crafted and thorough protective order that contained procedures for counsel access to detainees and to classified information.  *In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 143 (D.D.C. 2008) ("Protective Order" or "P.O.").  Judge Hogan's protective order was substantially similar to the protective order issued by Judge Green.

This Court recently revisited Judge Hogan's protective order as it pertained to detainees without any pending habeas petition before the Court.  *In re Guantanamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d 8 (D.D.C. 2012).  At that time, the government argued "that the Protective Order cease[d] to control counsel-access in the absence of a pending or imminent habeas petition" and sought to enter into Memoranda of Understanding (MOUs) with detainees that would set the terms for counsel access.  *Id.* at 11.  The terms of the MOUs proposed by the government differed substantially from those of Judge Hogan's Protective Order and would have hampered both petitioners' access to counsel and counsels' access to classified information.  *Id.* at 13–14.  This Court rejected the government's argument and the proposed MOUs.  Instead, the Court held that Judge Hogan's protective order governed counsel-access issues for all petitioners, including those without any pending habeas action.  *Id.* at 28.

---

[2] The Order specifically excluded cases over which Judge Richard Leon presided as well as *Hamdan v. Bush*, 04-cv-1519.  Order at 2 n.1, *In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442 (TFH) (July 2, 2008), ECF No. 1.

III.    **STANDARD OF REVIEW**

The foundation of the Supreme Court's habeas jurisprudence is that the Great Writ lies at the core of this nation's constitutional system and that it is the duty of the courts to remedy lawless executive detention.

> Executive imprisonment has been considered oppressive and lawless since John, at Runnymede, pledged that no free man should be imprisoned, dispossessed, outlawed, or exiled save by the judgment of his peers or by the law of the land. The judges of England developed the writ of habeas corpus largely to preserve these immunities from executive restraint.

*Rasul*, 542 U.S. at 474 (citing *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 218–219 (1953) (Jackson, J., dissenting)).  "The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom." *Boumediene*, 553 U.S. at 739; *see also Harris*, 394 U.S. at 290–91 (noting that the Great Writ serves as the "fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action.").  Moreover, the separation of powers also points to the fundamental importance of the Great Writ.  *See Boumediene*, 553 U.S. at 742 (noting that the separation of powers "serves not only to make Government accountable but also to secure individual liberty" (citing *Loving v. United States*, 517 U.S. 748, 756 (1996))). Indeed, under our Constitution it is the Suspension Clause that "protects the rights of the detained by affirming the duty and authority of the Judiciary to call the jailer to account." *Id.* at 745 (citing *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)).

The duty imposed by the Great Writ requires the Judiciary to ensure that access to the courts is "adequate, effective, and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822 (1977); s*ee also Harris*, 394 U.S. at 292.  Practically, this means "that the privilege of habeas corpus entitles the prisoner to *a meaningful opportunity to demonstrate* that he is being held pursuant to 'the

erroneous application or interpretation' of relevant law." *Boumediene*, 553 U.S. at 779 (quoting *INS v. St. Cyr*, 533 U.S. 289, 302 (2001)) (emphasis added).

In the context of Guantanamo Bay habeas litigation, "access to the Court means nothing without access to counsel." *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 22 (D.D.C. 2005).  They are inseparable concepts and must run together.

> To say that Petitioners' ability to investigate the circumstances surrounding their capture and detention is "seriously impaired" is an understatement. The circumstances of their confinement render their ability to investigate nonexistent. Furthermore, it is simply impossible to expect Petitioners to grapple with the complexities of a foreign legal system and present their claims to this Court without legal representation.  Petitioners face an obvious language barrier, have no access to a law library, and almost certainly lack a working knowledge of the American legal system.  Finally, this Court's ability to give Petitioners' claims the "careful consideration and plenary processing" which is their due would be stymied were Petitioners to proceed unrepresented by counsel.

*Al Odah*, 346 F. Supp. 2d at 9.

Cognizant of both its duty to enforce the Writ and the context of Guantanamo habeas litigation generally, the Court now turns to the petitioners' emergency motions for counsel access.

## IV.   JURISDICTION

The government contends that this Court lacks jurisdiction to address petitioners' emergency motions.  "Federal courts are courts of limited subject-matter jurisdiction.  A federal court created by Congress pursuant to Article III of the Constitution has the power to decide only those cases over which Congress grants jurisdiction." *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012) (citing *Micei Int'l v. Dep't of Commerce*, 613 F.3d 1147, 1151 (D.C. Cir. 2010)).

As amended by Section 7(a) of the Military Commissions Act of 2006, the federal habeas statute provides, in relevant part,

(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a *writ of habeas corpus* filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

(2) [N]o court, justice, or judge shall have jurisdiction to hear or consider *any other action* against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e)(1)–(2) (emphasis added).   However, the Supreme Court invalidated § 2241(e)(1) as an unconstitutional suspension of the writ, and thus this Court has jurisdiction over petitions for writs of habeas corpus.   *Boumediene v. Bush*, 553 U.S. 723, 792 (2008). Nevertheless, § 2241(e)(2) remains a valid bar to this Court's jurisdiction.   *See Al-Zahrani*, 669 F.3d at 319 (upholding "the continuing applicability of the [§ 2241(e)(2)] bar to our jurisdiction over 'treatment' cases.").   Thus, were this case an "other action"—that is, an action other than a petition for habeas corpus—relating to the "treatment . . . or conditions of confinement" of the Guantanamo detainees, this Court would have to dismiss for lack of jurisdiction.

The instant litigation, however, is not a general challenge to petitioners' treatment or conditions of confinement.   Instead, it is a narrow challenge to alleged government interference to petitioners' access to counsel that prevents them from prosecuting habeas cases before this Court.   Petitioners' challenge falls squarely within the Court's jurisdiction.   The Supreme Court implicitly recognized that counsel access issues relating to habeas cases fall within the district court's jurisdiction over habeas petitions.   In *Boumediene*, the Supreme Court explained that it "ma[de] no attempt to anticipate all of the evidentiary and access-to-counsel issues that will arise during the course of the detainees' habeas corpus proceedings. . . .   These and . . . other remaining questions are within the expertise and competence of the District Court to address in the first instance."   553 U.S. at 796.   Logically, the Supreme Court would not refer counsel-

access issues to the expertise of the District Court if it lacked jurisdiction to consider the issues in the first place.

Indeed, all the cases the government cites where this Court or the D.C. Circuit has concluded it lacked jurisdiction under § 2241(e)(2) are inapposite. The present controversy is neither a request for a mattress and a blanket, *see In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 312 (D.D.C. 2008), nor a request for transfer to another facility, *see Tumani v. Obama*, 598 F. Supp. 2d 67 (D.D.C. 2009); *Al-Shurfa v. Obama*, No. 05-CV-431 (RJL), 2009 WL 1451500 (D.D.C. May 21, 2009); *Khadr v. Bush*, 587 F. Supp. 2d 225 (D.D.C. 2008); *Al-Ghizzawi v. Bush*, No. 05-CV-2378 (JDB), 2008 WL 948337 (D.D.C. Apr. 8, 2008), nor a request for medical records or changes to medical procedures, *see Al Adahi v. Obama*, 596 F. Supp. 2d 111 (D.D.C. 2009); *In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d at 313–14, nor a tort claim against federal officials, *Al-Zahrani*, 669 F.3d at 316–17. This action focuses solely on what rules will govern counsel access for the Guantanamo detainees during their habeas cases and whether the government, in contravention of Judge Hogan's protective order and numerous other rulings, may interfere with detainees' access to counsel. Of course, it may not.

The government also argues that petitioners lack standing because they have failed to show "actual harm" under *Lewis v. Casey*, 518 U.S. 343 (1996). In *Casey*, the Supreme Court found that prisoners could not bring claims alleging interference with their access to the courts "by establishing that [the] prison's law library or legal assistance program is subpar in some theoretical sense." *Casey*, 518 U.S. at 351. Instead, the constitutional requirement for standing meant that prisoners could only bring claims alleging interference with their right of access to the courts where they could show actual injury. *Id.* at 349–352. The Court did find, however, that

an illiterate and non-English-speaking prisoner had established actual injury by showing that he had been unable to bring his claims.  *Id.* at 356.

The government's reliance on *Casey* is misplaced.  Quite contrary to the government's conclusory statement that petitioners have made no showing of actual harm, Opp'n 19, the record is replete with examples of "past or imminent official interference with individual [detainees'] presentation of claims to the courts."  *Casey*, 518 U.S. at 349.  For proof, one need only look to this Court's previous opinions concerning counsel access and the numerous government attempts to interfere with counsel access identified therein.  *See In re Guantanamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d at 24–26 (collecting cases).  Moreover, the petitioners' situation is most similar to that of the illiterate and non-English-speaking prisoners for whom the Supreme Court found there was actual injury in *Casey*.  With respect to detainees at Guantanamo, as this Court has oft repeated, "access to the Court means nothing without access to counsel."  *Al-Joudi*, 406 F. Supp. 2d at 22.  "Petitioners are from foreign countries, . . . do not speak English, and are in all likelihood totally unfamiliar with the United States legal system.  As such they have 'no alternative form of legal assistance available to them.'"  *Id.* (citing *Bounds v. Smith*, 430 U.S. 817, 823 (1977)).  Absent aid from counsel, petitioners will be unable to prosecute their habeas claims.  Thus, interference with petitioners' access to counsel impairs their access to the courts in a direct and concrete fashion and not "in some theoretical sense."  Petitioners have shown imminent harm and therefore have standing to bring their claims for counsel access.  Consequently, this court may exercise jurisdiction over those claims.

In concluding that it has jurisdiction over petitioners' motions, the Court notes that § 2241(e)(2) does remove the Court's jurisdiction over any action by Guantanamo detainees other than (1) a petition for habeas corpus or (2) any attendant issues that arise under that petition, such

as the counsel-access or evidentiary issues that the Supreme Court identified.  Thus, the court would lack jurisdiction to consider any claims by petitioners relating to, for example, their medical treatment or access to regular mail.  Of course, the Protective Order has always operated within the jurisdictional bounds set out by the Supreme Court in *Boumediene* and by § 2241(e)(2).  *See, e.g.*, P.O. at ¶¶ II.D.12–.13 (setting out in great detail the procedures to be used for processing detainee legal mail, but noting that any non-legal mail would be processed according to the military's standard operating procedures).

## V.   ANALYSIS

### A.   The *Turner v. Safley* Standard is Logically Inapplicable to this Case

The government contends that the new search procedures instituted by Col. Bogdan pass muster under the deferential standard for prison regulations identified by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987).  The government's reliance on the *Turner* standard is misplaced, however, as *Turner* is logically inapplicable to regulations impinging on a detainee's right to petition for a writ of habeas corpus.

The logical foundation of the *Turner* line of cases lies in striking a balance between a circumscribed constitutional right and the judgment of prison administrators.  The Supreme Court described this reasoning clearly in *Bell v. Wolfish*, 441 U.S. 520 (1979).  There, the Court laid out four "general principles [to] inform [its] evaluation of the constitutionality of the" prison regulations at issue.  *Id.* at 545.  First, the Court recognized "that convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement."  *Id.* (citing *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 129 (1977); *Meachum v. Fano*, 427 U.S. 215, 225 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 555–56 (1974); *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  Second, however, "[l]awful incarceration brings about the necessary

withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* at 545–46 (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)). Third, the Court noted that maintenance of security and internal order are penological "goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id.* at 546. Fourth, the Court acknowledged that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions." *Id.* at 547. Consequently, courts should accord "wide-ranging deference [to] the adoption and execution of policies and practices that" prison administrators judge necessary for preservation of order and security. *Id.* As the Court further explained, "judicial deference is accorded not merely because the administrator ordinarily will . . . have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Executive and Legislative Branches." *Id.* at 548 (citing *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)).

The logical progression of the Court's analysis in *Bell* is clear and simple: Prisoners retain basic constitutional rights, but those rights may be necessarily limited in the prison context. Further, the government, acting as prison administrator, may limit prisoners' constitutional rights to accomplish valid penological objectives. Finally, given the Executive and Legislative branches' particular roles and expertise in prison administration, the Judiciary should give deference to the Executive and Legislature in how they chose to circumscribe prisoners' rights to achieve legitimate penological ends. Most importantly for this case, the second principle that the Court identified acts as a logical predicate for the principles that follow: the Executive or Legislature may limit a prisoner's rights in order to accomplish valid penological objectives because those rights are limited or withdrawn in the prison context. Similarly, the

court defers to the Executive or Legislature because it has balanced the prisoner's limited rights against the valid penological interest according to its prerogatives and expertise. *Turner* adds to this analysis by formalizing the deference the Judiciary must show to the Executive and Legislature into a test, though the analysis and logic underlying the Court's decision remain the same. *See Turner*, 482 U.S. at 84–91.

This logical analysis, however, is inapplicable to the right of habeas corpus itself. The notion that habeas corpus, like the freedoms of association[3] or speech,[4] may necessarily be limited or withdrawn in the penological context is absurd: "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). The right of habeas corpus is neither limited nor withdrawn in the prison context—indeed it is most valuable as a right to one who is incarcerated. To restrict a detainee's access to habeas corpus solely by virtue of his detention would run counter to the writ's purpose and would eviscerate the writ.

Moreover, the particular circumstances of the petitioners in this case strengthen, rather than weaken, the power of the writ. As the Supreme Court recognized in *Boumediene*, "where[, as here,] a person is detained by executive order, rather than, say, after being tried and convicted in a court, the need for collateral review is most pressing. . . . In this context the need for habeas corpus is more urgent." 553 U.S. at 783; *see also Rasul*, 542 U.S. at 474 ("[A]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive

---

[3] *See, e.g.*, *Overton v. Bazzetta* 539 U.S. 126, 131 (2003) ("[F]reedom of association is among the rights least compatible with incarceration. . . . Some curtailment of that freedom must be expected in the prison context." (citing *Jones*, 433 U.S. at 125–26; *Hewitt v. Helms*, 459 U.S. 460 (1983)).
[4] *See, e.g.*, *Bell*, 441 U.S. at 550–51 (concluding that a prison rule against receipt of hardback books unless sent directly from publishers, book clubs, or book stores was reasonable and therefore did not violate inmates' First Amendment rights).

detention, and it is in that context that its protections have been strongest." (quoting *St. Cyr*, 533 U.S. at 301)).   Any effort by the Executive or Legislature to limit a detainee's right to seek habeas corpus, just as they might limit the detainee's freedoms of speech or association, would be antithetical to the purpose of the writ.   Indeed, the Constitution forbids suspension of the writ except in limited circumstances.   U.S. Const. art I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.").   This conflicts with the Court's logic in *Bell* and *Turner* because the right at issue is not limited in the prison context.

The Supreme Court's analysis in *Bell* and *Turner* cannot apply to petitioners.   Since the right to seek habeas relief is not limited or withdrawn in the prison context, neither may the Executive or the Legislature circumscribe the petitioners' right, s*ee id.*; *Boumediene*, 553 U.S. at 798, nor must the court defer to the Executive's or Legislature's attempt to do so.   Though the *Turner* test is inappropriate here, this Court need not define the contours of the proper test because the new procedures challenged by petitioners would fail even under *Turner*.

### B.     The New Search Procedures Fail Under the *Turner* Standard

As the Supreme Court has noted, "federal courts must take cognizance of the valid constitutional claims of prison inmates."   *Turner*, 482 U.S. at 84 (citing *Martinez*, 416 U.S. at 405).   "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."   *Id.*   For example, those detained at Guantanamo "may invoke the fundamental procedural protections of habeas corpus."   *Boumediene*, 553 U.S. at 798.   Because detainees retain certain constitutional rights like habeas, "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights."   *Martinez*, 416 U.S. at 405–06.

Nevertheless, the Court must recognize both the special expertise of the Executive and Legislature in prison administration and its own limited expertise in that area. "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 84–85. The Supreme Court has also identified prison administration as "a task that has been committed to the responsibility of those branches." *Id.* at 85.

In order to balance the competing considerations between prisoners' rights and prison administration, the Supreme Court formulated its test as follows: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. By contrast, a prison regulation is invalid if it represents an "exaggerated response" to legitimate penological concerns. *Id.* at 87. To aid its analysis, the Supreme Court identified "four factors [that] are relevant in deciding whether a prison regulation affecting a constitutional right that survives incarceration withstands constitutional challenge: whether the regulation has a 'valid, rational connection' to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are 'ready alternatives' to the regulation." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (quoting and citing *Turner*, 482 U.S. at 89–91).

Applying the first *Turner* factor, the Court finds that the new search procedures lack a "valid, rational connection" to the legitimate government interest—security—put forward to justify them. As the government correctly asserts, "internal security of detention facilities is a legitimate government interest." *Block v. Rutherford*, 468 U.S. 576, 586 (1984). The

government argues that three justifications satisfy the "valid, rational connection" between the revised search procedures and the government's legitimate penological interest in security of the Guantanamo detention facility: First, the old, modified search, i.e. shaking the detainee's waistband, is contrary to the military's standard procedure and increased the risk of inconsistent searches and decreased the searches' effectiveness.   Second, detainee Adnan Farhan Abd Latif (ISN 156) was able to commit suicide while in detention, and a subsequent review recommended changing the search policy in response.   Third, the transition of Camp 6 from communal living to single cell housing revealed contraband, including homemade weapons, shanks, and prohibited electronic devices.   The Court will address each of these justifications in turn.

The first justification, that the modified search used previously was contrary to the military's standard procedure, fails.   According to Col. Bogdan, since soldiers are not generally trained in the modified procedure previously used by the JDG, that procedure created a risk that the searches would be performed inconsistently and would be ineffective.   Opp'n 11; Col. Bogdan Decl. ¶ 17.   This justification does not hold water.   The modified search procedure had been in use since "the early years of detention operations at Guantanamo," or approximately eight or nine years.   Walsh Report 25.   The government does not explain how, other than by bald assertion, soldiers would be unable to follow a search procedure that had been in place for years. Moreover, American soldiers are intelligent and capable and have proven themselves able to implement correctly different protocols in different situations.   Indeed, the soldiers at Guantanamo do so already: one standard protocol is used for regular detainee mail and mail to the International Committee of the Red Cross, while a second protocol is used for legal mail.   *Id.* at 36–37; *see also* Protective Order ¶¶ II.D.12–.13.   This Court's previous opinion on legal mail notwithstanding, the soldiers and commanders at Guantanamo have proven themselves capable

of navigating the differences between these two systems.   Contrary to Col. Bogdan's bureaucratic desire for uniformity, every procedure employed at Guantanamo need not follow the same standard protocol.   As petitioners correctly argue, there is no basis in the record to support the government's argument that guards performed the old, modified searches ineffectively or inconsistently.   Pet'rs' Reply 3–4, June 4, 2013, ECF No. 44 ("Hatim Reply").

The government's second justification for the new search procedures involves the suicide of detainee Adnan Farhan Abd Latif.  Latif committed suicide in September 2012 by overdosing on medication that he had hoarded over a short time period.   Opp'n 11.   The command investigation performed after Latif's suicide noted that he *may have* hidden the medications in his groin area.  *Id.*; Bogdan Decl. ¶ 18.   According to the government, this incident provides a further "valid, rational connection" to satisfy the first *Turner* factor.   At this Court's sealed hearing on June 5, Counsel for petitioners noted, however, that Col. Bogdan's affidavit nowhere states that Latif *actually* hid medications in his groin area, only that the prior search procedure provided him with the opportunity to do so.   Sealed Hr'g Tr. 7; *see also* Bogdan Decl. ¶ 18.   In response, government counsel only stated that Latif "might" have hoarded medication in his groin area.  Sealed Hr'g Tr. 20.

Petitioners correctly conclude that Latif's possible opportunity to hoard medication bears no logical connection to a policy to search the groin area of every detainee every time he is moved or meets with non-JTF personnel, whether that be medical personnel, representatives from the International Committee of the Red Cross, or legal counsel.   Hatim Reply 4.   The government's attempts to justify the new procedure on the basis of Latif's suicide have the patina of pretext to them.   The mere possibility that Latif hoarded medications in his groin area, with nothing more, will not support the new search policy because the logical connection between the

policy and this supposed justification "is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90.

Moreover, the government's actions in regards to the command investigation of Latif's suicide belie the suggestion that Latif's death was a justification for the new search policies. Latif's death occurred in September 2012, and the command investigation of his death released its report in November 2012.  Bogdan Decl. ¶ 18.  Col. Bogdan and the JDG, however, did not implement the new search procedures until May 3, 2013.  *Id.*  Though Col. Bogdan states that he "developed a phased approach in December 2012 to gradually" implement the new search procedure, his statement stands in contrast to his decision to institute the new search procedures almost immediately upon discovering contraband in the transition of Camp 6 from communal housing to single cell housing.  *Id.*  To the Court's view, Col. Bogdan's swiftness in implementing the new searches in May 2013 shows that linking the new searches to the death of Latif and the subsequent investigation was merely an afterthought.

The third justification the government offers for the new search policies under the first *Turner* factor is the discovery of contraband in Camp 6.  According to Col. Bogdan's statement, in April 2013, the JDG transitioned Camp 6 from communal living for detainees to keeping detainees in individual cells.  *Id.*  In the course of the transition, the JDG discovered "a number of contraband items, including homemade weapons, such as shanks, and prohibited electronic devices."  *Id.*  The presence of contraband or weapons would represent a threat to camp security. On its face, this justification appears to offer the strongest logical relationship between the new search procedures and the government's legitimate interest in security at the Guantanamo detention facility.  Indeed, this Court "understand[s] why [prison administrators] might need to do an overall search of the prison to be sure there are no shanks" or other improvised weapons.

Sealed Hrg. Tr. 22.  The Court has heard of similar generalized searches at domestic prisons.  *Id.* (citing the local jail in Washington, D.C. as an example).

When viewed in isolation, as the government has presented it, the presence of contraband makes the new search procedure appear reasonably related to the government's legitimate penological interest in security.  The Court, however, must view the new procedure and the proffered justification in light of the government's previous actions at Guantanamo.  As petitioners' counsel correctly noted during this Court's hearing, "[t]he government is a recidivist when it comes to denying counsel access."  Sealed Hrg. Tr. 11.  The government, seemingly at every turn, has acted to deny or to restrict Guantanamo detainee's access to counsel.  The government designated Guantanamo as a "detention facility" rather than as a "corrections facility" because, under the Navy's own regulations, those incarcerated at a corrections facility have unconditional access to their attorneys.  *See In re Guantanamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d at 17.  The government sought to require detainees without pending habeas petitions to sign memoranda of understanding that would have removed them from the ambit of the Court's Protective Order and only allowed access to counsel at the government's whim.  *See id.* at 13–14.  The government has severely curtailed the number of flights to Guantanamo.  *See* Order at 4, *Al-Zarnouqi v. Obama*, No. 06-CV-1767 (RCL) (D.D.C. May 6, 2013), ECF No. 415.  Predictably, given the limited number of commercial flights to Guantanamo, counsel must now wait in queue for at least two months before they may meet with their clients.  Open Hr'g Tr. 20–21, June 5, 2013; *see also* Hatim Reply Ex. K ¶¶ 11–12 (noting that the limited flight schedule—counsel may only fly in on Mondays and out on Fridays— increases costs since counsel and translators must travel to Guantanamo for a full week).  The government has, in some instances, withheld legal mail from petitioners without notifying the

Court or petitioners' counsel.  *See* Order at 4, *Al-Zarnouqi v. Obama*, No. 06-CV-1767 (RCL) (D.D.C. May 6, 2013), ECF No. 415.  And this is to say nothing of the multiple instances this Court has identified where the government sought to inhibit counsel access in individual cases. *See In re Guantanamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d at 24–26 (collecting cases).  The government's repeated actions substantially increase the likelihood that its justification is mere pretext and that the new searches represent an "exaggerated response" to its legitimate interest in security of the detention facility.  Thus, a thorough examination of the government's proffered justification is appropriate.

While the Court agrees that the presence of improvised weapons and contraband is logically related to the need for searches generally, the Court finds the new genital search procedure to be yet another exaggerated response by the JDG that is presently inhibiting petitioners' access to counsel.  Since implementation of the new search procedure, multiple petitioners have foregone, some for the first time, phone calls or meetings with counsel.  Hatim Mot. 4–5; Hatim Mot. Ex. A ¶¶ 13–18; Hatim Mot. Ex. B; Hatim Mot. Ex. C ¶¶ 7–10; Hatim Mot. Ex. D ¶¶ 7, 11–12; Hatim Mot. Ex. E ¶¶ 3–7; Hatim Mot. Ex. F ¶¶ 4–6; Hatim Reply 7–8; Hentif & Al Shubati Mot. Ex. A ¶¶ 4–6, 8.  This does not represent, as the government argues, "mere voluntary refusal" on each petitioner's part.  Opp'n 14.  Instead, the Court finds that the new search procedures actively discourage petitioners from taking phone calls or meeting with counsel.  As petitioners' counsel argued, the choice between submitting to a search procedure that is religiously and culturally abhorrent or foregoing counsel effectively presents no choice for devout Muslims like petitioners.  Open Hr'g Tr. 19; Sealed Hr'g Tr. 14–15; Hentif & Al Shubati Mot. Ex. A ¶¶ 8.  The relationship between the searches and petitioners' choices to refuse phone calls and counsel meetings is clear and predictable.  Indeed, petitioners also find searches of the

Quran abhorrent, and many petitioners have chosen to forego having a Quran in their cells rather than having their Qurans subject to search.  Hatim Mot. Ex. A ¶¶ 3, 22, 24–25; *see also* Charlie Savage, *Officials Describe Chaos at Guantanamo in Weeks Before Raid on Prison*, N.Y. Times (Apr. 16, 2013), http://www.nytimes.com/2013/04/17/us/politics/detainees-hit-guards-in-weekend-raid-officials-say.html (noting that detainees offered to end the current hunger strike by giving up their Qurans rather than have them be searched).

That this relationship is so clear and predictable makes it easy for the government to exploit.  Given that detainees are already shackled and under guard whenever they are moved, Hatim Mot. Ex. A ¶ 5, the added value of the new genital search procedure vis-à-vis the prior search procedure is reduced.  In this context, the court finds searching the genitals of petitioners up to four times for every phone call or attorney–client meeting—as petitioners have described, Hatim Mot. Ex. B ¶¶ 7–8, 15; Sealed Hr'g Tr. 39—to be excessive.  Searching detainees up to four times in this manner for every movement, meeting, or phone call belies any legitimate interest in security given the clear and predictable effects of the new searches.  Moreover, as petitioners note, nothing in the record indicates that detainees have received any contraband from their attorneys or that detainees have attempted to pass contraband to each other during phone calls or meetings with attorneys.  Hatim Reply 4–5.  The motivation for the searches is not to enhance security but to deter counsel access.  Thus, the Court finds the search procedure an "excessive response" under the first *Turner* factor.

Turning to the remaining factors identified in *Turner*, the second factor considers "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90.  Here, the government again argues that it is not inhibiting counsel access and that it is petitioners who have voluntarily chosen to forego phone calls or meetings with

counsel.  Opp'n 24.  As above, the Court rejects the government's argument.  As petitioners'
counsel noted, the predicable consequences of the government's actions are "the breaking [and]
severing of attorney–client communication except by letter which is by slow boat."  Open Hrg.
Tr. 19.  The Court recognizes that, as petitioners argue, it would be untenable to prepare a habeas
case for trial or appeal where counsel could only contact petitioners by legal mail.  Hentif & Al
Shubati Mot. 5.  Absent face-to-face meetings and telephone calls, petitioners' habeas cases will
not go forward.  Thus, the new search procedures effectively leave petitioners without alternative
avenues to exercise their right to habeas corpus.

The third *Turner* factor looks at "the impact [that] accommodation of the asserted
constitutional right will have on guards and other inmates, and on the allocation of prison
resources generally."  *Turner*, 482 U.S. at 90.  Here, the government contends that "[r]everting to
the old search policy . . . would mean restoration of the same security risks to detainees, guards,
and counsel, and the same operational disruptions and difficulties."  Opp'n 24.  But, as
petitioners correctly argue, the record presents no connection between the prior search
procedures and any such "disruptions or difficulties."  Indeed, the record does not show that
guards performed searches inconsistently, and the government can show only a possible
connection of the prior search procedures to the death of detainee Latif.  Further, given that
detainees are watched and shackled during transport, and that guards may search detainee's cells
or the detainees themselves at other times, the "ripple effect" of reverting to the prior search
procedure for attorney–client meetings should be minimal.

The fourth *Turner* factor looks to the "absence" or "existence" of "ready alternatives" to
the challenged regulation.  *Turner*, 482 U.S. at 90.  The Supreme Court explained that "the
absence of ready alternatives is evidence of the reasonableness of a prison regulation," but "the

existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* The petitioners easily satisfy this factor. As this court counseled in its previous counsel-access opinion, "if it ain't broke, don't fix it." *In re Guantanamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d at 16. Given its many years of use at the Guantanamo detention facility, the old modified search procedure represents an "obvious, easy," and proven alternative to the challenged new search procedure. The government's assertion that these searches may have led to Latif's suicide or the presence of contraband is purely speculative and does not diminish the fact that the prior procedure represents an easy alternative.

In summary, the Court finds the evidence submitted by petitioners and contained in the record sufficient to carry their burden to show that the new search procedure is an "exaggerated response" to the JDG's concerns. Further, the Court finds the government's proffered justifications for the new search procedure unpersuasive in light of the evidence in the record. Thus, the Court will order that the modified search procedure be used for in-person detainee meetings with counsel and for detainee phone calls with counsel.

### C.      The JDG Must Allow Certain Detainees to Meet with Counsel in the Housing Camps

The Court now turns to the petitioners' request that the Court order JTF-GTMO to allow detainees to meet with counsel in their housing camps. At the outset, the Court recognizes that under the current regime, the government has the prerogative to select the location for attorney–client meetings. Under the Protective Order, "[l]egal visits shall take place in a room designated by JTF-Guantanamo." ¶ II.C.11.b;[5] *see also* ¶ II.J.37 ("Counsel will meet with detainees in

_____

[5] In the published version of Judge Hogan's Protective Order, paragraph II.C.11 has two sub-paragraphs designated "a." As this citation is to the second of those sub-paragraphs, the Court corrects the typographical error in its

conference facilities provided by GTMO.").   Of course, the government's control over the location for attorney–client meetings under the Protective Order is subject to revision.  *See id.* ¶ II.A.1 ("Except as otherwise stated in these Procedures . . . or by other Order issued in the United States District Court for the District of Columbia, the following procedures shall govern counsel access to all detainees [at GTMO].")  Though the Protective Order gives substantial deference to JTF-GTMO, as is appropriate, the overarching context of the protective order is one in which the government may exercise its prerogatives as prison administrator, but must do so reasonably. *See, e.g.*, *id.* ¶ II.C.11.a–.b (requiring that JTF-GTMO use reasonable efforts to accommodate counsel's requests for meetings with their clients and that the Commander, JTF-GTMO will not unreasonably withhold approval for more than two attorneys and one translator to meet with a detainee at one time).  This standard of reasonableness is appropriate as it is, arguably, what would be required under *Turner*.

Applying the first *Turner* factor, the government offers two justifications for the policy forbidding attorney–client meetings in the detainees' housing camps.  The government's first justification is, essentially, that the meeting rooms in Camp Echo are in some way better for the detainees and counsel than any room available in Camp 5 or 6.  *See* Opp'n 9 (noting that the Camp Echo meeting rooms have separate spaces for detainee prayer and that, at Camp Echo, counsel may "watch DVDs, read books, and share food with their clients").   While Col. Bogdan's desire to provide detainees with better accommodations for attorney–client meetings is admirable, it has nothing to do with the government's interests in security or camp operations. Moreover, it is undercut by the petitioners' assertion that the change inhibits counsel access.  The government's second set of justifications, however, is more substantial.

The government identifies several logistical concerns that it contends favor restricting

citation for purposes of clarity.

attorney–client meetings to Camp Echo.   First, the government notes that all visitors to Guantanamo, including attorneys, must pass through visitor screening at Camp Echo regardless of their destination within the detention facility.   *Id.*; Bogdan Decl. ¶ 6.   Second, the government points to the need to divert guards and Staff Judge Advocates to escort counsel to and from meetings in the housing camps.   Opp'n 9; Bogdan Decl. ¶ 15.   Third, the government contends that meetings in the housing camps will impair movements of other detainees in the housing camps as other detainees cannot be moved while a detainee is moving to or from a meeting in the housing camp.   Opp'n 10; Bogdan Decl. ¶ 15.   Fourth, and most importantly, the government argues that meetings in the housing camps divert guards from other tasks because the guards must monitor the attorney–client meetings.   Opp'n 10; Bogdan Decl. ¶ 15.

The government's first three justifications are easily dismissed.   As to the first, the fact that all the attorneys must enter the detention facility via Camp Echo has no logical bearing on whether detainees may meet with their attorneys in the housing camps or only at Camp Echo. Indeed, habeas counsel have expressed no concern with whatever added inconvenience a trip from Camp Echo to Camp 5 or 6 might represent.   Moreover, the government has raised no concerns about movement of counsel within the facility.   As to the second justification, petitioners' counsel correctly reason that the guards may escort the detainee to Camp Echo or counsel to the housing camps, but in either case they must escort someone somewhere.   Hatim Reply 5–6; *see also* Bogdan Decl. ¶ 7 ("JTF-GTMO maintains an escort staff of guards whose exclusive mission is to support movements of detainees and visitors, including habeas counsel."). Presumably, escorting the attorneys should be the easier of the two insofar as counsel need not be shackled for the trip.   The government's third justification is likewise inadequate: if only one detainee may be moved at a time, the problem of coordinating detainee movements will exist

regardless of whether detainees meet with their attorneys in Camp Echo or in the housing camps since detainees must move through their housing camps in either case.

The government's fourth justification, however, requires more careful consideration. The government argues that allowing detainees to meet with their attorneys in Camp 5 or 6 would negatively impact the availability of the guard force. Opp'n 10, 23. Specifically, the lack of a centralized video-monitoring facility in Camps 5 or 6 of the sort that exists in Camp Echo means that guards must be stationed outside the meeting room "to ensure the safety of counsel and to discourage and prevent misconduct by the detainee." Opp'n 10, 23; *see also* Bogdan Decl. ¶ 15. Of course, stationing guards outside the room for attorney–client meetings diverts the guards from other duties and, the government contends, may interfere with camp operations. Opp'n 10, 23; Bogdan Decl. ¶ 15. The allocation of guard staff and their duties requires considerations of "planning . . . and the commitment of resources," *Turner*, 482 U.S. at 85, for which the Executive has expertise and to which the Judiciary typically defers. The courts need not give blind deference, however. Indeed, the Court must examine the regulation in its context to determine if there is a valid, rational connection to legitimate penological interests.

Examination of the context of detention at Guantanamo shows that the JDG's regulation forbidding attorney–client meetings in Camps 5 or 6 lacks a valid, rational connection to the government's legitimate penological interests in security or orderly administration. To be sure, allowing attorney–client meetings in the housing camps will divert some guards away from their other duties, but the Court must recognize that the practical effect of petitioners' request is limited. As Adm. Walsh identified, there is only one room for attorney–client meetings in Camp 5, Walsh Report 11, and Col. Bogdan identified two rooms that could be used for attorney–client meetings in Camp 6. Bogdan Decl. ¶ 14. Assuming that the JDG must station two, or even

three, guards outside the meeting rooms, allowing attorney–client meetings would divert a maximum of two to three guards in Camp 5 and four to six guards in Camp 6.  The Court is confident the JDG can spare these guards to accommodate the use of one attorney–client meeting room in Camp 5 and two attorney–client meeting rooms in Camp 6.  Moreover, the Court must remain cognizant of the fact that almost two-thirds of those detained at Guantanamo, including several of the petitioners, are engaged in a weeks-long hunger strike.  Hatim Mot. 3.  Those detainees engaged in the hunger strike are, expectedly, in a substantially weakened physical state.  *Id.*; *see also id.* Exs. A–G (describing the physical state of detainees engaged in the hunger strike).  In such a state, detainees are both (1) less able to move from their housing camps to Camp Echo or Camp Delta and (2) less of a security risk.  Indeed, in the context of the hunger strike, failure to accommodate petitioners' reasonable request seems less like a valid choice on the part of the JDG commander and more like an attempt to deny counsel access through alternative means.

The Court now turns to the remaining *Turner* factors.  Applying the second factor, the Court finds that, for those detainees participating in the hunger strike who are too weak to go to Camp Echo to meet with counsel, no alternatives to exercise their right to petition for habeas corpus exist.  As this Court stated above, any attempt to bring a habeas petition where attorney–client communications are limited to legal mail would be untenable.  Applying the third *Turner* factor, the Court finds that the "ripple effect" of accommodating the detainees' request would be minimal given the limited facilities available for attorney–client meetings at Camps 5 and 6.  Finally, under the last *Turner* factor, allowing limited attorney–client meetings in Camps 5 and 6 is an obvious and reasonable accommodation for those detainees too weakened by the hunger strike to travel to Camp Echo.

In summary, the Court finds the JDG's policy of forbidding attorney–client meetings in the housing camps to be an exaggerated response to the government's penological interests in security and orderly operations.  The Court will amend Judge Hogan's Protective Order to require that the JDG allow attorney–client meetings in Camps 5 and 6 for those detainees who are in a weakened physical state due to participation in the hunger strike or who have a medical condition that similarly makes travel outside the housing camps difficult.  Given the limited space available for attorney–client meetings in Camps 5 and 6, counsel for petitioners and government counsel shall meet to establish procedures to ensure that the limited availability for attorney–client meetings in the housing camps is apportioned fairly amongst the detainees.

### D. The JDG Must Allow Certain Petitioners to Use the Old Vans for Transport to Camps Echo and Delta

Due to the limited space for attorney–client meetings at Camps 5 and 6, some detainees may still need to travel to Camps Echo and Delta for attorney–client meetings and phone calls.  Thus, the Court now turns to petitioners' challenge to the vans used by JDG to transport detainees from their housing camps to Camps Echo and Delta.  Applying the same considerations that it applied to the regulations concerning attorney–client meetings in the housing camps, the Court concludes under *Turner* that detainees engaged in the hunger strike should be allowed to use the old vans for transport to Camps Echo or Delta.

At the outset, the Court must applaud the JDG's effort to accommodate detainees request for new vans with better air conditioning and its ongoing effort to modify those vans to allow detainees to sit upright during transport.  Bogdan Decl. ¶ 22.  Thus, the Court hopes any accommodation it requires in this regard will be short lived.  Applying the first *Turner* factor, as between the old vans and the unmodified new vans, no penological interest favors the use of one

over the other.  The government admits that the old vans are still available for use use and that it

purchased the new vans as part of a "routine fleet upgrade and to address detainee complaints

about a lack of air conditioning in the older vans."  Opp'n 10.  The government's decision to

replace the vans does not implicate its penological interest in security or orderly operations.

Nothing, for example, suggests the old vans are any less secure than the new vans.   Applying the

remaining *Turner* factors, the Court finds that accommodating the detainees' request here would

be truly costless.  Indeed, given that the old vans are still available and just as good, the cost to

the JDG to use one of the old vans rather than one of the unmodified new vans is zero.  The

government tacitly admits this insofar as it allows detainees with certain medical conditions to

use the old vans while the new vans are being modified.  Bogdan Decl. ¶ 22.  Detainees

participating in the hunger strike should be accommodated similarly.  Indeed, given the

importance of the right to habeas corpus and access to counsel for the detainees, wisdom

counsels in favor of granting a truly costless request like the one petitioners have submitted here.

## VI.   CONCLUSION

In closing his speech at the National Defense University, the President quoted Judge

William Young.  *See* Remarks by the President at the National Defense University.   In

sentencing Richard Reid, the shoe bomber, Judge Young told him that "[t]he way we treat you . .

. is the measure of our own liberties."  *Id.*  Judge Young's comment is equally apt when applied

to the detainees at Guantanamo.

This Court is duty bound to protect the writ of habeas corpus as a fundamental

prerequisite of liberty by ensuring that all those who seek it have meaningful and effective access

to the courts.  For Guantanamo detainees, it is undisputed that access to the courts means nothing

without access to counsel.  The JDG's behavior, exemplified by the new search and meeting

procedures, flagrantly disregards the need for a light touch on religious and cultural matters that Admiral Walsh recognized years ago.  Further, the search procedures discourage meetings with counsel and so stand in stark contrast to the President's insistence on judicial review for every detainee.  The Court, whose duty it is to call the jailer to account, will not countenance the jailer's interference with detainees' access to counsel.

For the foregoing reasons, the Court finds the challenged procedures and regulations invalid as they pertain to counsel access.  The Court further concludes, pursuant to ¶ I.E.34 of the Protective Order, that this Memorandum Opinion and the accompanying Order issued this date should not be designated as protected, but will be available on the public record.  Given the limits of this Court's jurisdiction, the Court's holding does not affect the ability of the JDG to continue to administer the Guantanamo detention facility as it finds appropriate with respect to issues unrelated to counsel access.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on July 11, 2013.